LORENZ SUPPLY COMPANY v AMERICAN STANDARD, INC

Docket No. 66357. Argued March 10, 1983 (Calendar No. 20).—Decided December 3, 1984.

Lorenz Supply Company brought an action in the Wayne Circuit Court against American Standard, Inc., seeking damages for breach of contract, breach of a written agreement to sell inventory, and breach of an oral distributorship agreement. The court, Irwin H. Burdick, J., entered judgment for the plaintiff for the claims of breach of the inventory sales agreement and breach of the distributorship agreement. The Court of Appeals, T. M. Burns, P.J., and R. M. Maher and Clements, JJ., affirmed (Docket No. 78-5200). The defendant appeals, asserting that the distributorship agreement was a contract for the sale of goods, governed by Article 2 of the Uniform Commercial Code, and was unenforceable for lack of a sufficient writing.

In an opinion by Justice Levin, joined by Chief Justice Williams, and Justices Kavanagh, Ryan, Cavanagh, and Boyle, the Supreme Court *held:*

The distributorship agreement between the parties is not a contract for the sale of goods within the meaning of the Uniform Commercial Code.

1. A contract for the sale of goods under the UCC must state in writing the quantity of goods involved. The quantity term may not be inferred. Such a writing does not prove the terms of a contract, but merely removes the statutory bar to enforcement of the contract whether its terms, other than the quantity, be written, oral, or partly written and partly oral. In this case, the fact that a contract existed was mentioned in a letter from the defendant to the plaintiff; however, the letter did not state the quantity of the goods involved. Distributorship agreements, such as the agreement in this case, generally are

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 17 Am Jur 2d, Contracts §§ 81, 240.

Construction and effect of UCC Article 2, dealing with sales. 17 ALR3d 1010.

[3, 4] 67 Am Jur 2d, Sales §§ 99-101.

72 Am Jur 2d, Statute of Frauds § 295.

uncertain with regard to quantity. To apply the written quantity requirement to such agreements would render them out of compliance with the code and, hence, unenforceable if deemed to be contracts for the sale of goods. The drafters of the code did not intend that all distributorship agreements be regarded as contracts for the sale of goods.

2. The defendant was not prejudiced by the jury's apparent misunderstanding of the instruction to return a verdict of at least a particular amount on the defendant's counterclaim because the parties consented to a judgment on the counterclaim in excess of that amount. Also, the jury's verdict in favor of the plaintiff for breach of the agreement to sell inventory in an amount less than that admittedly owed the defendant was not inconsistent as a matter of law with its finding that the defendant breached the distributorship agreement.

Justice Brickley, concurring, stated that a distributorship agreement between a manufacturer of goods and a distributor of the goods that provided for the ongoing transfer of goods in a commercial setting was a transaction in goods, including the sale of goods, subject to the provisions of Article 2 of the Uniform Commercial Code, including the Statute of Frauds of that article. A letter from the manufacturer's agent to the distributor confirming the arrangement and implying that the quantity of goods to be delivered by the manufacturer to the distributor would be dependent on market demand was a sufficient writing under the circumstances to satisfy the quantity requirement of the Statute of Frauds.

1. Article 2 of the Uniform Commercial Code applies to transactions in goods. A contract for the sale of goods is a transaction in goods and includes present and future sales of goods. A distributorship agreement, such as the agreement in this case, that provides for the ongoing transfer of goods between a manufacturer and the distributor, construed in the light of the intent of the framers of the code to enable it to expand to encompass unforeseen and new commercial circumstances and practices, is a contract for the sale of goods, subject to Article 2.

2. Because the distributorship agreement is a contract for the sale of goods, it is subject to the article's Statute of Frauds. A contract for the sale of goods for $500 or more must be made in writing and must specify the quantity of the goods involved. In this case, a letter from the defendant's agent welcoming the plaintiff's president as a distributor who would be supplied with goods by the defendant was sufficient to satisfy the writing and quantity requirements of the Statute of Frauds. "Distributor-

ship" means the practice of a manufacturer furnishing its distributor with sufficient products to fill the distributor's orders. The specific quantity of goods to be delivered under the agreement was not capable of being calculated in advance because the actual quantity required during the term of the agreement was dependent on market demand. Under the circumstances, the quantity referred to in the letter was as specific as necessary.

Affirmed.

100 Mich App 600; 300 NW2d 335 (1980) affirmed.

OPINION OF THE COURT

1. SALES — UNIFORM COMMERCIAL CODE — DISTRIBUTORSHIP AGREE-
MENTS.

   A distributorship agreement between a manufacturer of goods and a distributor of the goods that did not specifically state the quantity of goods involved in writing was not a contract for the sale of goods within the meaning of the Uniform Commercial Code (MCL 440.2201; MSA 19.2201).

2. SALES — UNIFORM COMMERCIAL CODE — DISTRIBUTORSHIP AGREE-
MENTS.

   A contract for the sale of goods under the Uniform Commercial Code must state in writing the quantity of goods involved; such a writing does not prove the terms of a contract, but merely removes the statutory bar to enforcement of the contract whether its terms, other than the quantity, be written, oral, or partly written and partly oral (MCL 440.2201; MSA 19.2201).

CONCURRING OPINION BY BRICKLEY, J.

3. SALES — UNIFORM COMMERCIAL CODE — DISTRIBUTORSHIP AGREE-
MENTS.

   *A distributorship agreement between a manufacturer of goods and a distributor of the goods that provided for the ongoing transfer of goods in a commercial setting was a transaction in goods, including the sale of goods, subject to the provisions of Article 2 of the Uniform Commercial Code, including the Statute of Frauds of that article (MCL 440.2101 et seq.; MSA 19.2101 et seq.).*

4. SALES — UNIFORM COMMERCIAL CODE — DISTRIBUTORSHIP AGREE-
MENTS — STATUTE OF FRAUDS.

   *A letter from a manufacturer's agent to a distributor confirming an oral ongoing agreement that the distributor would be supplied with goods by the manufacturer in a quantity sufficient to meet market demands was sufficient under the circumstances*

to satisfy the quantity requirement of the Statute of Frauds of
the Uniform Commercial Code (MCL 440.2201; MSA 19.2201).

*Lampert, Fried & Levitt, P.C.* (by *Gary E. Levitt*
and *David M. Fried),* for the plaintiff.

*Clark, Klein & Beaumont* (by *J. Walker Henry,*
*James E. Baiers,* and *Suanne Tiberio Trimmer)* for
the defendant.

LEVIN, J. The principal question presented is
whether the distributorship agreement[1] between
Lorenz and American Standard is a "contract for
the sale of goods" within the meaning of § 2-201 of
the Uniform Commercial Code.[2] We hold that it is
not and affirm the decision of the Court of Appeals
affirming the judgment entered by the circuit
court on the jury's verdict in favor of Lorenz.

---

[1] Plaintiff Lorenz Supply Company and defendant American Standard, Inc., entered into an agreement whereunder Lorenz agreed to purchase $420,000 worth of plumbing inventory from American Standard. The jury found that, at the same time, the parties agreed that Lorenz was to become a distributor of American Standard products in the Detroit area. The terms of the inventory sale agreement, but *not* the distributorship agreement, were set forth in writing.

Subsequently, a dispute arose concerning the performance of the inventory sale agreement. Lorenz withheld payments totaling $65,100 for goods received because it believed that it was owed over $70,000 for alleged errors pertaining to the inventory sale. American Standard then refused to supply additional products under the distributorship agreement unless Lorenz paid cash in advance.

Lorenz filed the instant action claiming breach of both the written inventory sale agreement and the oral distributorship agreement. The complaint sought $2,000,000 in damages. American Standard counterclaimed for approximately $72,000 for products delivered under the inventory sale agreement.

The jury awarded Lorenz $45,000 on the inventory claim and $255,000 on the distributorship claim. Although the circuit judge directed the jury to find for American Standard on its counterclaim in an amount between $65,100 and $72,106.08, the jury found no cause of action on the counterclaim. After the judge ordered a new trial on the counterclaim issue only, the parties stipulated that American Standard would recover $69,873.40 on the counterclaim.

The Court of Appeals affirmed. 100 Mich App 600; 300 NW2d 335 (1980). This Court granted leave to appeal. 412 Mich 864 (1981).

[2] MCL 440.2201; MSA 19.2201.

I

Lorenz pleaded and the jury found that Lorenz entered into a distributorship agreement with American Standard. The only written evidence of this agreement was a letter from American Standard to Lorenz that "welcome[d]" Lorenz "to the numbers of American Standard distributors across the country."

Section 2-201 does not require that the terms of a contract for the sale of goods, other than the quantity term, be expressed in writing.[3] The requirements of § 2-201 are satisfied if the writing indicates that "a contract of sale has been made between the parties" and "specif[ies] a quantity". 2 Anderson, Uniform Commercial Code (3d ed), § 2-201:97, p 61.[4]

The concurring opinion recognizes that the quantity term of a distributorship agreement is generally uncertain, and to require that it be stated with certainty would put most distributorship agreements out of compliance with § 2-201 and, hence, if a distributorship agreement is a "contract for the sale of goods", make them unenforceable. The concurring opinion seeks to avoid this dilemma by inferring a quantity term. The

---

[3] The Official Comment to § 2-201 provides, in part:

"The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. * * * *The only term which must appear is the quantity term* which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." (Emphasis added.)

[4] It appears that most, if not all, commentators agree with Anderson's observation that § 2-201 requires that a writing must specify a quantity. See, *e.g.,* Calamari & Perillo, The Law of Contracts, § 313, p 486; White & Summers, Uniform Commercial Code (2d ed), § 2-4, pp 59-60; 3 Duesenberg & King, Uniform Commercial Code Service (Bender), § 2.04[2][a], p 2-59.

quantity term must, however, under § 2-201, be specifically stated.[5]

A requirements or output term of a contract, although general in language, nonetheless is, *if stated in the writing,* specific as to quantity, and in compliance with § 2-201.[6] However, not all distributorship agreements are requirements or output contracts. The jury was not asked to decide whether the instant distributorship agreement contained a requirements or output term, and this Court would exceed its role if it were to imply a provision akin to a requirements term.[7] Under the construction advanced in the concurring opinion, American Standard could maintain an action against Lorenz for failure to purchase its requirements whether the parties agreed thereto or not.

Because many distributorship agreements are not requirements or output contracts and in such cases the quantity term is generally uncertain, we conclude that the drafters of the Uniform Commercial Code did not intend that all distributorship agreements be regarded as "contract[s] for the sale of goods".[8]

## II

A writing that satisfies § 2-201 does not prove

[5] See fn 4 and *Doral Hosiery Corp v Sav-A-Stop, Inc,* 377 F Supp 387, 389 (ED Pa, 1974), stating that the written inclusion of a quantity term is "mandatory" under the UCC.

[6] See *Cox Caulking & Insulating Co v Brockett Distributing Co,* 150 Ga App 424, 426; 258 SE2d 51 (1979); 3 Duesenberg & King, Uniform Commercial Code Service (Bender), § 2.04[2][a], p 2-59; 2 Anderson, Uniform Commercial Code (3d ed), §§ 2-201:113, 2-201:114, p 70.

[7] Other courts have refused to hold that a distributorship agreement contains an implied term that the seller will supply the buyer with its requirements. See, *e.g., Eastern Dental Corp v Isaac Masel Co, Inc,* 502 F Supp 1354, 1364 (ED Pa, 1980); *Cavalier Mobile Homes, Inc v Liberty Homes, Inc,* 53 Md App 379, 395; 454 A2d 367 (1983).

[8] We express no opinion on the question whether a distributorship agreement may fall within the broader category of "transactions in goods" within the meaning of § 2-102 of the UCC, MCL 440.2102; MSA 19.2102.

the terms of a contract; such a writing merely removes the statutory bar to the enforcement of the contract whether its terms—other than the quantity term which alone must be specified in writing—be written, oral, or partly written and partly oral. In the instant case, the letter from American Standard to Lorenz welcoming him as a distributor indicates that a contract was made between the parties. If one concludes, as would the author of the concurring opinion, that the letter satisfies the requirements of § 2-201, then the terms of the instant agreement, whatever those terms might be, are enforceable. Because the terms of a contract for the sale of goods, other than the quantity term, need not be stated in writing, the declaration in the concurring opinion that § 2-201 applies to distributorship agreements does not bear on the disputed terms of the instant distributorship agreement.

### III

Turning to another issue, American Standard was not prejudiced by the jury's apparent misunderstanding of the judge's instruction that it must bring in a verdict of at least $65,100 on American Standard's counterclaim; the parties have consented to a judgment on the counterclaim in excess of that amount.

The jury's $45,000 verdict on Lorenz's claim against American Standard for breach of the agreement for the sale of inventory is not inconsistent *as a matter of law* with its finding that American Standard breached the distributorship agreement. It is generally a question of fact whether a breach by a buyer, Lorenz, is so far material as to justify the seller, American Stan-

dard, in terminating their contract.[9] American Standard did not ask for a jury finding on this issue and thereby waived such a finding. This Court would exceed its role if it were to decide as a matter of law that Lorenz's failure to pay a portion of the amount admittedly owed by Lorenz to American Standard was a material breach justifying American Standard in terminating the distributorship agreement that the jury found was entered into.[10]

## IV

We all agree that the other assignments of error were adequately dealt with in the opinion of the Court of Appeals.

Affirmed.

WILLIAMS, C.J., and KAVANAGH, RYAN, CAVANAGH, and BOYLE, JJ., concurred with LEVIN, J.

BRICKLEY, J. *(concurring).* This case presents for the first time in this state the question whether the Uniform Commercial Code, MCL 440.1101 *et seq.;* MSA 19.1101 *et seq.,* and its Statute of Frauds, MCL 440.2201; MSA 19.2201, are applicable to a distributorship agreement, and whether the Statute of Frauds' quantity requirement can be satisfied by a writing stating that one party is a distributor of another's products. I would answer yes to both questions.

[9] See Farnsworth, Contracts, § 8.16, p 612; 3A Corbin, Contracts, § 700, p 309.

[10] Even if Lorenz's failure to pay $20,100 constituted a breach, it was for the jury to determine the materiality of the breach. It is not for this Court to decide as a matter of law whether Lorenz's failure to pay $20,100 of the $65,100 admittedly owed to American Standard justified, under the circumstances, American Standard in terminating the distributorship agreement.

I

In July of 1972, plaintiff Lorenz Supply Company was engaged in a family-owned and operated business selling "in the wall" plumbing items, such as pipes and valves, in the Detroit area. Defendant American Standard, Inc., a major manufacturer of diversified products, was planning to close out a heating and plumbing distribution outlet in Troy, run by its Amstan supply division.

Plaintiff's president, Robert Lorenz, desirous of expanding his plumbing line to "out of the wall" fixtures, such as sinks and faucets, entered into negotiations with defendant's local management. These negotiations resulted in an agreement whereby Lorenz would purchase $420,000 worth of inventory from defendant's Troy warehouse and take responsibility for its outstanding delivery orders. As part of the inducement for the inventory sale, Lorenz was to be made a "preferred" distributor of defendant's products. Plaintiff's president testified at trial that defendant promised to use its best efforts to supply items on a regular basis as they were needed and that plaintiff could distribute defendant's products for as long as it desired.

The arrangement for the inventory sale was reduced to a specific writing which set forth the details for transfer of the goods. The goods were to be transferred from the defendant's warehouse in August 1972. When Mr. Lorenz inquired as to the distributorship part of the arrangement, he was advised that it was the policy of defendant not to have written distributorship agreements. However, in the following month plaintiff received a confirmation letter from an official of defendant corporation. It expressed "happiness with the way our whole negotiations turned out with regard to your

purchase of the Amstan inventory and, more importantly, to welcome you to the numbers of American Standard distributors across the country". Lorenz immediately began to enlarge his facilities and augment his staff in preparation for the distributorship and its expected enhancement of his business.

Unfortunately, happiness did not become a hallmark of the relationship. Lorenz first became concerned that defendant was not honoring the terms of their agreement at the time of the inventory transfer in August of 1972, when he received reports that some of the fastest-selling inventory from the Troy warehouse was seen departing for destinations other than plaintiff's business. Lorenz would later testify that some of the fastest-selling items from the inventory were sold to other distributors. Lorenz also testified that defendant overcharged him for some of the items he received from the sale, and charged for some items not received at all. Lorenz further testified at trial that, when he complained to defendant about these various errors, he was told on several occasions that restitution would be made for the missing inventory, and that he should keep track of the billing errors so that the total amount could be offset against his account at a later date.

The dispute between the parties and efforts to resolve it continued through the remainder of 1972 and into 1973. Finally, in December 1973, plaintiff, claiming that it was owed $72,000 by defendant as a result of the alleged errors, refused to pay approximately $65,000 otherwise owing to defendant.[1] Defendant, disputing these assertions, ad-

---

[1] Plaintiff was to pay defendant $420,000, in six $70,000 monthly installments, for the inventory in defendant's Troy warehouse. Plaintiff was also purchasing additional materials from the defendant under the distributorship arrangement. The record is not clear as to

vised plaintiff that it would be cut off from further products if it did not pay on its account. When the payment was not received by January 1974, defendant placed plaintiff on "credit hold", meaning that plaintiff could receive additional products only by paying cash in advance.

Meanwhile, plaintiff filed suit for breach of contract. Defendant denied a breach and counterclaimed for the monies due according to defendant's accounting. Robert Lorenz testified at trial that he secured additional financing, at great personal cost, in order to continue to buy essential items from defendant in cash. This in turn compounded his financial problems. Finally, in June 1974, defendant advised plaintiff that because of "restrictions placed on your orders by the credit department * * * we are cancelling all open orders as of June 15, 1974". Plaintiff filed for bankruptcy in March 1975, and at the time of trial was a defunct corporation.

Plaintiff offered evidence at trial that it was saddled with a quarter-million dollar "dead" inventory because it was denied essential related products by defendant, both because it did not receive promised material from the Troy warehouse and because of the refusal of the defendant to continue to furnish products under the distributorship agreement. Lorenz further testified that, in spite of contracting for $420,000 worth of inventory from the Troy warehouse, he received only $260,000 worth of products.

The trial judge instructed the jury that there were "two separate issues that are at issue in this case; one, an issue with respect to the sale of the

precisely how much of the disputed credits or debits between the parties was attributable to the inventory sale as opposed to ongoing purchases of non-inventory merchandise. It is likely the accounts were combined.

inventory at the Troy warehouse of American Standard, and the second issue being permitting Lorenz Supply Company to distribute American Standard's products in the Detroit area".

The judge then instructed the jury, in pertinent part:

"Now, we want three verdicts from you. You will have to separate on this basis and announce your verdict. One, with respect to the Amstan purchase, either find for the plaintiff—if you find for the plaintiff against the defendant, you will determine the amount of money to which you believe the plaintiff is entitled, and you will announce your verdict as being in favor of the plaintiff on the Amstan purchase and whatever the amount is. If you find there is no liability on the part of the defendant with respect to the Amstan purchase, you will announce your verdict as being in favor of the defendant no cause for action on the Amstan purchase. You will also render a verdict with respect to the distributorship agreement. Again, if you find that the defendant is liable and that the plaintiff is entitled to damages as a result of the breach of the distributorship agreement, you will consider that amount of money. Having made that determination you will announce your verdict as being in favor of the plaintiff with respect to the distributorship. Announce the money for the plaintiff against the defendant.

"If you find there is no liability, you will announce your verdict as being in favor of the defendant on the distributorship agreement a judgment of no cause of action. Then you will render your verdict as to the counterclaim for the defendant, which I stated to you shall not be any less than $65,100 nor any more than $72,106.08. You must render a verdict in these three categories."

The jury found a breach of the inventory sale and awarded damages to plaintiff in the amount of $45,000, a breach of the distributorship agreement for which they awarded plaintiff $255,000 in dam-

ages, and, finally, contrary to the judge's instructions directing a verdict in favor of defendant on the counterclaim, the jury found no cause of action on the counterclaim. Defendant argued that the jury's failure to follow the judge's instructions on the counterclaim required a new trial on all issues. However, after some expression of concern by the trial judge as to the effect of the jury's confusion on the counterclaim,[2] he ordered a new trial on that issue only. Subsequently, the parties stipulated to an amount of $69,873.40 on the counterclaim, avoiding a retrial on that issue.

Defendant argued before the Court of Appeals, as it does here, that the distributorship agreement was a "transaction in goods" under Article 2 (Sales) of the Uniform Commercial Code and, therefore, was subject to the Statute of Frauds of that article, thus making it unenforceable since the letter welcoming the plaintiff as a distributor did not satisfy the "writing" requirement.[3] Defendant also contested the admission of certain evidence relating to lost profits and argued that the jury's erroneous verdict on the counterclaim invalidated the entire verdict and should have entitled them to a new trial on all issues. Finally, defendant argues that even if it is enforceable, the distributorship agreement was terminable at will, thus precluding any damage award for lost profits.

The letter from defendant to plaintiff, which is the only written evidence of the distributorship

[2] In his decision on defendant's motion for a judgment notwithstanding the verdict or a new trial, the trial judge commented, "[d]id the jury, by its conduct in refusing in following the instructions given to them by the court, taint the entire verdict because of its not following the instructions of the court? It was not following the instructions of the court. This is what has disturbed the court all of this period of time."

[3] The appellants are not contesting the $45,000 verdict for breach of the inventory sale.

aspect of the arrangement between the parties, reads as follows:

"Dear Bob:

"Now that you have officially joined the family of American Standard distributors, I want to record with you my extreme happiness with the way our whole negotiations turned out with regard to your purchase of the Amstan inventory and, more importantly, to welcome you to the numbers of American Standard distributors across the country.

"Ed and I are most enthusiastic about your ability to help us participate in larger measure in the Detroit market and I hope the opportunity will soon present itself when I can express my sincerest welcome to those other Lorenz personnel who I have not yet met but on whom we are counting for the strongest possible support in a very difficult market.

"It is a pleasure to have you with us and I trust that our association will be mutually beneficial for many years to come.

"Sincerely yours,

"Bren O'Connell."

The Court of Appeals, 100 Mich App 600, 608; 300 NW2d 335 (1980), found that the distributorship agreement did not come within the purview of the UCC since the "agreement did not require Lorenz to buy a certain quantity of goods or, indeed, to buy *any* goods from the defendant in the future". Rather, they said, "[t]his agreement envisioned an ongoing economic relationship". The Court did allow that "Lorenz was granted the status of a 'preferred distributor' who would be entitled to purchase plumbing fixtures manufactured by the defendant in the future". Based on that relationship—that plaintiff need not buy but defendant must sell—the Court found the distributorship agreement to be outside of the Uniform

Commercial Code and its Statute of Frauds and therefore enforceable.

The Court of Appeals further said that even if it had found the UCC to be applicable, the letter from the defendant to the plaintiff was a "sufficient written memorandum of the previous oral agreement to satisfy the requirements" of the Statute of Frauds. The Court further stated that "Lorenz never undertook to buy any of defendant's products, so the $500 statutory amount was never triggered". Finally, it said, "[a]lthough the quantity term is omitted, in the context of a distributorship agreement such an indefiniteness is inherent to the relationship and would not defeat the validity of the contract where the parties agreed. See MCL 440.2204(3); MSA 19.2204(3), MCL 440.2306(1); MSA 19.2306(1)." The Court did not deal with the counterclaim verdict question.

I disagree with both the analysis and conclusion of the Court of Appeals.

Dealing first with the Court of Appeals dictum that the $500 limit of the Statute of Frauds was not triggered, I see nothing in the record or arguments of the parties that would indicate that there was to be a $500 limit on what was to be covered by the distributorship agreement. To the contrary, the record reflects that thousands of dollars' worth of products were sold by defendant to plaintiff. The other two points of the Court's holding, that the UCC was not applicable to this type of distributorship agreement and the question of the satisfaction of the quantity term, are important issues, largely novel to our jurisprudence.

II

On the applicability of the UCC, the Court of Appeals did not distinguish between the "transac-

tion in goods" criteria for the general application of Article 2 and the more specific finding of a "contract for the sale of goods", critical for the applicability of the Statute of Frauds. Instead, the Court of Appeals opined that the distributorship agreement did not fit the Statute of Frauds "contract for the sale of goods" definition and therefore held that the UCC, seemingly in its entirety, does not apply.

Appellants argue forcefully that such an interpretation would leave a major and fast-growing type of commercial activity outside the code. I agree.

Section 2-102 of the UCC, MCL 440.2102 *et seq.;* MSA 19.2102 *et seq.,* provides "[u]nless the context otherwise requires, this article applies to *transactions in goods"* (emphasis added), whereas the Statute of Frauds of the UCC, MCL 440.2201; MSA 19.2201 provides:

"[A] *contract for the sale of goods* for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made * * *. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." (Emphasis added.)

MCL 440.2106; MSA 19.2106 defines "contract for sale" as both a "present sale of goods and a contract to sell goods at a future time."

"Transaction in goods" is a broad term and on its face would seem to cover an agreement that has as its purpose the ongoing transfer of title to goods between the parties. The UCC is to be "liberally construed", MCL 440.1102; MSA 19.1102, and is designed to "provide its own machinery for expansion of commercial practices. It is

intended to make it possible for the law embodied in this act to be developed by the courts in the light of unforeseen and new circumstances and practices." UCC § 1-102, Official Comment 1.

The predominant holdings among those states which have considered this issue are to the effect that a distributorship agreement is subject to the UCC, although there is anything but a consistent rationale for the holdings. Because cases involving distributorship agreements have involved different sections of Article 2, the courts have variously focused on the words "transaction in goods", "contract for the sale", or "goods". We have found nowhere a case which is precisely on point with the facts of this case, nor has our research disclosed a case with the exact legal analysis which we think is required to properly resolve the issue before us.

Our conviction that Article 2 itself contemplates a distributorship agreement is buttressed by our observation that sections of Article 2 other than the Statute of Frauds quite clearly include distributorship agreements within their scope. Section 2-306, MCL 440.2306; MSA 19.2306, which validates contract terms which measure quantity by the output of the seller or the requirements of the buyer, clearly encompasses agreements that contemplate ongoing commercial arrangements such as are involved in a normal distributorship. Indeed, Official Comment No. 1 to this section states that "[i]t applies to such contracts of nonproducing establishments such as dealers or distributors as well as to manufacturing concerns". Similarly, § 2-309, MCL 440.2309; MSA 19.2309, which deals with a "contract * * * for successive performances [that] is indefinite in duration", clearly lends itself to a distributorship arrangement.

Cases from other jurisdictions support this con-

clusion. For example, in *Zapatha v Dairy Mart, Inc*, 381 Mass 284; 408 NE2d 1370 (1980), where the issue was the right to terminate a franchise agreement, the Massachusetts court held that the agreement was a "transaction in goods" and was therefore subject to the UCC. Again, where the issue was termination of a service station franchise the New York Supreme Court in *Division of Triple T Service, Inc v Mobil Oil Corp*, 60 Misc 2d 720, 727; 304 NYS2d 191 (1969), held the franchise to be covered by the UCC:

"At first blush one might assume that the Uniform Commercial Code does not reach franchise or distributorship agreements * * *. However, the courts have not been reluctant to enlarge the type of commercial transactions clearly encompassed within the spirit and intendment of the statute".

In accord with the holding of these cases and for the other reasons stated, I have no difficulty in finding the distributorship agreement in question to be subject to Article 2 of the UCC.

The more difficult and separate question is the applicability of the Statute of Frauds, MCL 440.2201; MSA 19.2201, to the distributorship agreement. I see it as a separate question because the term "contract for the sale of goods" is clearly more restrictive than the term "transaction in goods".

The prevailing authority clearly favors holding a distributorship agreement to be a "contract for the sale of goods". In *Leibel v Raynor Mfg Co*, 571 SW2d 640, 642 (Ky App, 1978), the Kentucky Court of Appeals disagreed with a lower court decision that a garage door distributorship was not covered by the UCC. It held:

"Article II of the Uniform Commercial Code applies

to transactions involving goods and merchandise. 'A contract between an automobile manufacturer and automobile dealer is a contract of sale since it is apparent that its overall purpose and object is to effect the sale of the automobiles manufactured by the manufacturer, and the fact that it may speak in terms of franchises does not change its true character.' 1 Anderson, UCC (2d ed), § 2-101:5, p 201."

The section of the UCC in question in *Leibel* dealing with termination, § 2-309, only uses the word "contract", unlike those sections, including the Statute of Frauds, that refer to a "contract for the sale of goods". Nonetheless, the Kentucky Court of Appeals did not make that distinction and held implicitly that a distributorship is both a "transaction in goods" and a "contract for the sale of goods". In *Artman v International Harvester Co,* 355 F Supp 482 (WD Pa, 1973), a federal district court, applying Pennsylvania law, held that an oral heavy-duty truck franchise was subject to the UCC and its Statute of Frauds and was therefore unenforceable because there was no writing signed by the party to be charged.

In *DeFilippo v Ford Motor Co,* 516 F2d 1313 (CA 3, 1975), *cert den* 423 US 912 (1975), the Third Circuit Court of Appeals, also applying Pennsylvania law, held that an auto dealership was a "contract for the sale of goods" and therefore subject to the Statute of Frauds of the UCC. The court's discussion in that case focused on its observation that the distributorship arrangement encompassed more than merely the sale of goods, such as the providing of related services. The *DeFilippo* court rejected the argument that the UCC no longer applies if the arrangement involves both goods and services, holding:

"[if], viewed as a whole, it can be concluded that the

essential bulk of the assets to be transferred qualify
*[sic]* as 'goods', then it is appropriate to consider the
transaction a 'contract for the sale of goods'. To insist
that all assets qualify as 'goods' would substantially
thwart the intentions of the drafters of the Uniform
Commercial Code; it would sanction the absurd." *DeFilippo, supra,* p 1323.

The *DeFilippo* court held the contract at issue in
that case to be unenforceable for lack of a signature.

The opposite result was reached in *Tile-Craft
Products Co, Inc v Exxon Corp,* 581 SW2d 886, 889
(Mo App, 1979), where the Missouri Court of Appeals held that a distributorship for cabinet parts
was not encompassed in the "cover" provisions of
UCC § 2-712, stating:

"Tile-Craft seems to take the position that the entire
distributorship entity was the 'goods' which the seller
failed to deliver, * * * but we do not believe that a
distributorship is contemplated within the U.C.C. definition of 'goods'."

A year later the Eighth Circuit, in *Vigano v
Wylain, Inc,* 633 F2d 522, 525 (CA 8, 1980), applied
Missouri law in declining to hold an oral distributorship agreement unenforceable as violative of
the Statute of Frauds:

"Wylain contends as a matter of law that plaintiff's
claims are barred by the Statute of Frauds provision in
Article 2 of the Uniform Commercial Code * * *. The
clearest indication of Missouri law on this question,
however, is to the effect that distributorship agreements
are not covered by Article 2 [citing *Tile-Craft, supra].*"

However, the court then added the following footnote:

"We are inclined to disagree with this position as a matter of commercial law. Article 2 applies to transactions in goods, and the modular homes in question, seem clearly to fit the § 2-105(1) definition of goods. Moreover, § 2-106(1) defines 'contract for sale' to include both a present sale of goods and a contract to sell goods at a future time. Thus, the distributorship agreement would seem under the general view to be within the scope of Article 2. *Corenswet, Inc v Amana Refrigeration, Inc,* 594 F2d 129 (CA 5, 1979)."

In the only case applying Michigan law to the issue, the federal district court, in *Warner Motors, Inc v Chrysler Motors Corp,* 5 UCC Rep 365 (1968), found that an auto dealership was within the definition of a "contract for sale" under § 2-725, the Statute of Limitations of Article 2 of the UCC.

Finally, in a case most factually analogous to the one at bar, *Cavalier Mobile Homes, Inc v Liberty Homes, Inc,* 53 Md App 379, 394; 454 A2d 367 (1983), the Maryland Court of Special Appeals found that a mobile home sales distributorship was a "contract for the sale of goods" and therefore subject to the Statute of Frauds. In finding that the agreement was in violation of the Statute of Frauds, the court stated:

"[UCC § 2-106] defines 'contract for sale' to include both a 'present sale of goods and a contract to sell goods at a future time'. It follows therefrom that dealership or distributorship contracts fall within the sales provisions of the UCC * * *. It also follows that the Article II Statute of Frauds, found at § 2-201, applies to such agreements."

The court proceeded to hold the agreement unenforceable because neither conforming writing relied upon by the plaintiff stated any quantity term.

"Our view of this distributorship is that each time
Cavalier ordered a home from Liberty, a separate con-
tract of sale was entered into by the parties. This series
of contracts, evidenced by invoices, does not indicate
that a requirements contract existed, *i.e.,* that there
was a contract to fill Cavalier's requirements. Each
invoice solely reflects the terms and quantity of individ-
ual transactions. There is no indication that quantity is
to be measured by requirements. Accordingly, this
course of dealing cannot supply the quantity term to
satisfy the Statute of Frauds." *Cavalier, supra,* pp 395-
396.

My observation of the conflicting views repre-
sented in the above cases is that the majority of
holdings implicitly say that a distributorship
agreement is subject to the Statute of Frauds
because it is a contract *dealing* with the sale of
goods (or, stated differently, a contract for the sale
of goods once removed). The minority view,
adopted by our Court of Appeals in this case, says
that, because the distributorship does not itself
bind the parties to a specific transfer of specific
goods, it is not a "contract for the sale of goods";
rather, as defendant characterizes it, it is "akin to
an umbrella underneath which there were a series
of commercial transactions between merchants".[4]

I think it wise when interpreting a uniform act,

---

[4] We are not troubled by the relatively indefinite nature of most
distributorship agreements; we believe that both the requisite consid-
eration and mutuality can be found to exist despite the inherently
imprecise terms. The UCC, with its provisions for successive perfor-
mances, MCL 440.2309; MSA 19.2309, and indefinite quantity terms,
MCL 440.2306; MSA 19.2306, envisions very loose arrangements that
are reinforced by the code with its requirement of "good faith". MCL
440.1203; MSA 19.1203. See *J W Knapp Co v Sinas,* 19 Mich App 427;
172 NW2d 867 (1969). Furthermore, in the typical distributorship
arrangement, an agreement by one party to sell without a correspond-
ing agreement by the other to buy, as the Court of Appeals suggests
exists in the instant case, is usually accompanied by other forms of
consideration, such as exclusive territories, best efforts by the distrib-
utor to market the manufacturer's products, and the like. As such,
these arrangements are distinguishable from those agreements whose
quantity term is totally unascertainable.

to join what is developing as a clear majority on this question, especially because of our previously mentioned conviction that it furthers the overall intent and scope of the UCC, and to consider the arrangement a contract for the sale of goods.

### III

This does not end the inquiry, however. The key factual question in this case is whether the letter from defendant's agent to plaintiff's president satisfied the quantity requirement necessary for a contract to be enforceable under the Statute of Frauds.

In *Cavalier, supra,* the majority view of the Statute of Frauds is applied for the first time in combination with the "quantity" requirement of the Statute of Frauds with the result that unless a distributorship agreement writing specifies a quantity it is unenforceable.

I cannot, as did the Court of Appeals, completely dismiss the quantity requirement even though I agree that "in the context of a distributorship agreement such an indefiniteness is inherent in the relationship". 100 Mich App 609. Indeed, if the quantity term was construed to require a numerically specific quantity of goods, the net result would be that most distributorships by their nature could never comply with the Statute of Frauds. It would indeed be an anomalous result to hold such contracts subject to the UCC and its Statute of Frauds and then proceed to hold them all unenforceable for lack of a sufficiently definite quantity term.

---

"The Michigan court does not enforce contracts calling for the purchase or sale of such goods as may be 'desired', 'ordered', or 'wished'. Such contracts are distinguishable from the usual output or requirements contracts because the promisor is not bound to deliver or accept any sufficiently definite quantity." MCLA 440.2306 practice commentary, p 247.

The code obviates such an interpretation in § 2-306, which provides:

"(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

While this provision does not specifically refer to § 2-201, it would be difficult to argue that it does not impliedly define quantity as it is used in § 2-201. As previously noted, the official comment to § 2-306 states specifically that it applies to "contracts of nonproducing establishments such as dealers or distributors as well as to manufacturing concerns".

In *Kubik v J & R Foods of Oregon, Inc*, 282 Or 179, 187-188; 577 P2d 518 (1978), the Oregon Supreme Court, in interpreting an exclusive dealing contract, stated:

"As noted, ORS 72.3060 [the counterpart of § 2-306] is a statute designed, among other things, to define 'quantity'—as that item is required by the UCC's own Statute of Frauds—in those situations in which, because of the nature of the contract, a particular quantity cannot be identified in advance with certainty."

I may not go so far as to suggest that § 2-306 is intended to define quantity in § 2-201, but I think it indicates at least that Article 2 of the UCC does not contemplate any rigid definition of the term quantity as it is used anywhere in Article 2, including § 2-201. If it did not refer to the word quantity in § 2-201, then § 2-306 would be without purpose.

Traditional restrictions on requirements contracts and the need to have the quantity term ascertainable have been based on the need to supply consideration in such contracts. The UCC, particularly § 2-306, makes it clear that the code intends contracts to be upheld even where the terms are indefinite by reading into such contracts "good faith" requirements, thus allowing a quantity term as imprecise as an agreement to furnish the distributor with his needs.[5]

The obvious purpose of the Statute of Frauds is to require the understanding of the parties regarding the quantity of goods involved to be spelled out in the writing. Even if the quantity is as imprecise as an agreement to furnish the goods that the plaintiff needs to serve his customers, it is important to have that understanding in writing. As the Maryland court stated in *Cavalier Mobile Homes, supra,* p 395:

"The Statute of Frauds requires that even where the quantity term is not numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements."

The letter in question was signed by the party "against whom enforcement is sought"—an agent of the defendant. The only question remaining is whether the language of the letter shows that the parties intended that defendant was obliged to supply plaintiff with its requirements, indefinite though it was.

The letter from defendant to plaintiff stated, "[n]ow that you have officially joined the family of American Standard distributors", and "more importantly, to welcome you to the numbers of

_____
[5] See fn 4.

American Standard distributors across the country", and "Ed and I are most enthusiastic about your ability to help us participate in larger measure in the Detroit market".

It is perfectly clear from this writing that plaintiff was to be a distributor for defendant, who would supply plaintiff with products to sell "in the Detroit market"; it is equally obvious that in a distributorship the manufacturer must furnish the distributor with sufficient goods to be a successful distributor. The specific quantity of goods to be delivered under the distributorship agreement could have been determined only by the demand generated, and could not have been calculated in advance. Rather, the quantity term was as specific as necessary under these circumstances. The only thing left unsaid in the letter are the words "we will supply those goods necessary for you to represent us in your area". It would have been redundant to do so because the words of welcome to the "family of American Standard distributors" told it all. The word distributorship means the practice of a manufacturer furnishing its distributor with the products it needs to fill its orders. The parties have never, throughout the course of this litigation, disputed the fact that the defendant was required to furnish those goods ordered by the plaintiff, subject to certain conditions. The disagreement is over whether the defendant was justified in cutting off the plaintiff from further deliveries because plaintiff refused to pay its bill.

I conclude that the agreement between the parties was a contract for the sale of goods under the UCC and its Statute of Frauds and that there was a writing satisfying the quantity requirement of that statute. The distributorship agreement should be enforceable.