908 F.2d 972
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AB PRODUCTS, Plaintiff-Appellee,
v.
DAMPNEY COMPANY, INC., Defendant-Appellant.
 No. 89-1871.
 United States Court of Appeals, Sixth Circuit.
 July 24, 1990.
 
 Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an action for breach of an oral distributorship contract. The main question presented on appeal is whether the district court erred in holding that under Michigan law the contract was enforceable notwithstanding the supposed absence of any writing signed by the defendant. We find no error in the district court's resolution of this question, and we shall affirm the court's judgment.
 
 
 2
 * The plaintiff in this case, AB Products, is the sole-proprietorship of a Michigan resident named George Neisch, Jr. Aware that Ford Motor Company's Rouge Steel operation was dissatisfied with the steel-marking paint it was using, AB Products made inquiry about acquiring the right to distribute a high-temperature industrial coating called "Thermolux 2900." Thermolux 2900 is manufactured by defendant Dampney Company, Inc., a Massachusetts corporation. On March 31, 1986, Dampney sent a letter to AB Products salesman Wayne Higgins describing the properties of its paint and stating "[i]f we are successful at supplying this product to you, and your customer Rouge Steel, we will issue a Distributor agreement assigning Rouge Steel to your company as the Distributor."
 
 
 3
 AB Products thereupon began negotiations with Rouge Steel to sell it Thermolux 2900. After a series of tests, Rouge Steel approved the product in July of 1987. AB Products also made efforts to sell the paint to Wheeling-Pittsburgh Steel Company, and in due course those efforts proved successful too.
 
 
 4
 During the negotiations over a distributorship, Dampney had sent AB Products a form distributorship agreement dated June 2, 1986. Mr. Neisch rejected this form because it did not include all of the Dampney products he wanted to distribute. Dampney subsequently transmitted a form manufacturer's representative agreement dated March 24, 1987. Mr. Neisch rejected this form because he wanted a distributorship. A distributorship could be sold when he retired, he testified, but a manufacturer's representative franchise could not.
 
 
 5
 After Rouge Steel's approval of Thermolux 2900 in July of 1987, Neisch, Higgins, and a Dampney product manager named Thomas Trane met to discuss the establishment of a distributorship. At this meeting the parties entered into an oral contract making AB Products a distributor for Dampney's products. Mr. Neisch subsequently testified to an understanding that the contract could not be terminated by Dampney without good reason. Both Mr. Trane and Dampney Vice President-Treasurer Raymond Pavlik also testified that their distributorship agreements would not be terminated without cause.
 
 
 6
 Mr. Neisch testified that Mr. Trane promised to reduce the agreement to writing and send it to him. This was never done, and the parties operated under the oral agreement for several months.
 
 
 7
 In October of 1987 Dampney decided to terminate the distributorship. On November 5, 1987, Dampney sent a letter to Rouge Steel stating that "we have run into a serious accounts receivable collection problem with our current distributor." The letter went on to say that AB Products' current purchase order on behalf of Rouge Steel could not be honored, and suggested that Rouge Steel consider purchasing directly from Dampney. Dampney officials admitted at trial that the decision to terminate had been made without prior warning to or discussion with AB Products.
 
 
 8
 AB Products maintained that it was not behind in its payments to Dampney because the agreement had been that it would not have to pay Dampney until its own customers paid it. Charging Dampney with breach of the distributorship contract, promissory estoppel, tortious interference with business relationships, and defamation, AB Products brought a federal action invoking the court's diversity jurisdiction. The case went to trial before a jury.
 
 
 9
 The district court directed a verdict for Dampney on all claims but that for breach of contract. The contract claim was submitted to the jury, which found that Dampney had violated the agreement by terminating it without just cause. The jury awarded AB Products $26,760 for lost profits up to the date of the breach and $100,000 for future lost profits. By stipulation, the district court reduced this award by the amount of Dampney's counterclaim for payments that AB Products had withheld after it filed suit. The court denied Dampney's request for judgment NOV on the issue of future damages, and judgment was entered against Dampney in the net amount of $100,125.39. This appeal followed.
 
 II
 
 10
 Dampney contends that the absence of a writing renders the distributorship agreement invalid under both the Michigan version of Sec. 2-201 of the Uniform Commercial Code, Mich.Comp.Laws Sec. 440.2201, and under Michigan's general Statute of Frauds, Mich.Comp.Laws Sec. 566.132. Dampney raised this point in a motion for a directed verdict at the close of the plaintiff's case, and the court summarily rejected it without discussing the question whether the existence of an adequate writing had been shown.
 
 
 11
 * Mich.Comp.Laws Sec. 440.2201(1) provides as follows:
 
 
 12
 "Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."
 
 
 13
 (The exceptions to the section are not relevant here.)
 
 
 14
 In Lorenz Supply Co. v. American Standard, Inc., 419 Mich. 610, 358 N.W.2d 845 (1984), the Michigan Supreme Court held that a distributorship agreement with no quantity term was not a "contract for the sale of goods" within the meaning of Sec. 440.2201. It follows, we believe, that the distributorship agreement between AB Products and Dampney was not a contract for the sale of goods either; and if it was not a contract for the sale of goods, Sec. 440.2201 does not make the agreement unenforceable in the absence of a writing.
 
 B
 
 15
 Michigan's general Statute of Frauds, Mich.Comp.Laws Sec. 566.132, provides in pertinent part that:
 
 
 16
 "In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be charged therewith, or by a person authorized by him:
 
 
 17
 (a) An agreement that by its terms is not to be performed within 1 year from the making thereof."
 
 
 18
 The distributorship agreement in the present case did not, by its terms, provide that it was not to be performed within one year. Dampney's cross-examination of Mr. Neisch disclosed that no term of years was ever mentioned or discussed. Mr. Neisch did testify that one "certainly could expect [the agreement] to last for 15 years," but such an expectation, by itself, could not bring the agreement within the statute:
 
 
 19
 "The mere fact that the contract may or may not be performed within the year does not bring it within the statute. The rule is that if, by any possibility, it is capable of being completed within a year, it is not within the statute, though the parties may have intended and thought it probable that it would extend over a longer period, and though it does so extend." Smalley v. Mitchell, 110 Mich. 650, 652, 68 N.W. 978, 979 (1896).
 
 
 20
 The Michigan Court of Appeals recently quoted this passage in Rowe v. Noren Pattern and Foundry Co., 91 Mich.App. 254, 257, 283 N.W.2d 713, 715 (1979), a case that involved the termination of an oral employment contract. Rejecting a Statute of Frauds defense, the court noted that because "the company could have been closed down within one year or since plaintiff could have performed his assigned duties so poorly as to give his employer just cause to discharge him, the contract of employment could have been for less than a year." 91 Mich.App. at 256, 283 N.W.2d at 715.
 
 
 21
 The situation in the present case is similar. Dampney could have gone out of business within the year, or Mr. Neisch could have died within that time or could have given Dampney cause to terminate the agreement. In Commercial Factors Corp. v. Zephyr Awning Corp., 353 Mich. 251, 91 N.W.2d 511 (1958), on which Dampney relies, there was an express agreement for a three-year distribution franchise. 353 Mich. at 253-54, 256, 91 N.W.2d at 513, 514. No such time period was specified here, and Commercial Factors is not controlling; there was clearly a possibility in the instant case that the contract might be completed within a year.
 
 III
 
 22
 If the agreement is an indefinite one for Statute of Frauds purposes, Dampney argues that it must be a contract at will, and that AB Products is thus not entitled to future damages. See Dunn v. Goebel Brewing Co., 357 Mich. 693, 99 N.W.2d 380 (1959), where the court found no cause of action when a beer supplier refused to continue selling to its distributor. In Goebel, however, the contract expressly provided for termination upon written notice, and did not provide that the termination had to be for cause. Because notice was given, the Michigan Supreme Court held, the supplier had complied with the terms of the contract. In the present case, by contrast, the agreement was terminable only for cause. In finding Dampney guilty of a breach of contract, the jury necessarily found that no cause for termination existed. Under these circumstances it was not inappropriate to award damages based on lost future profits. We are aware of no Michigan authority holding that future profits may not be recovered upon breach of a contract for an indefinite term, where the contract is terminable only for cause.
 
 
 23
 The judgment is AFFIRMED.