LORENZ SUPPLY COMPANY v AMERICAN STANDARD, INC

Docket No. 78-5200. Submitted May 12, 1980, at Detroit.—Decided October 8, 1980.

Lorenz Supply Company brought an action for breach of contract against American Standard, Inc., alleging breach of a written agreement to sell Lorenz inventory of a division of American Standard and breach of an oral distributorship agreement. Defendant counterclaimed for monies due for plaintiff's purchases. Wayne Circuit Court, Irwin H. Burdick, J., entered judgment for plaintiff on both counts and found no cause of action on defendant's counterclaim. Defendant moved for a judgment notwithstanding the verdict or a new trial. The court set aside the judgment as to the counterclaim and ordered a new trial. The parties stipulated for an amendment of this judgment and for the recovery by defendant of a sum of money on its counterclaim, and the court so ordered. Defendant appeals the judgment for plaintiff for breach of contract, alleging that the distributorship agreement was a contract for the sale of goods and unenforceable for lack of a sufficient writing, that the trial court erred in submitting the issue of damages on the distributorship agreement to the jury where plaintiff made no attempt to mitigate damages by seeking cover, that the trial court erred by allowing the jury to consider lost profits with

REFERENCES FOR POINTS IN HEADNOTES

[1] 67 Am Jur 2d, Sales § 99.
[2] 67 Am Jur 2d, Sales § 8.
[3] 67 Am Jur 3d, Sales §§ 65, 75.
[4] 17 Am Jur 2d, Contracts § 444.
[5] 22 Am Jur 2d, Damages § 330.
[6] 22 Am Jur 2d, Damages § 172.
[7] 22 Am Jur 2d, Damages § 25.
[8] 22 Am Jur 2d, Damages § 178.
[9] 81 Am Jur 2d, Witnesses §§ 105, 106.
[10] 30 Am Jur 2d, Evidence § 1082.
[11] 22 Am Jur 2d, Damages § 342.
[12] 23 Am Jur 2d, Depositions and Discovery § 99.
[13] 5 Am Jur 2d, Appeal and Error § 881.
[14] 23 Am Jur 2d, Depositions and Discovery §§ 104, 108.

respect to the distributorship agreement where such loss was entirely speculative and based on conjecture, that the admission of plaintiff's testimony concerning lost profits which was inconsistent with figures in its corporate records constituted error, and that the trial court erred in refusing to allow defendant to use a witness's deposition in its case in chief. *Held:*

1. The distributorship agreement envisioned an ongoing economic relationship between plaintiff and defendant rather than a contract for sale, and, thus, plaintiff was not precluded from asserting the oral agreement by the statute of frauds in the Uniform Commercial Code.

2. The record reveals that there was some attempt to mitigate damages, and, thus, allowing the issue to go to the jury did not constitute reversible error.

3. Lost profits resulting from a breach of contract are proper items of loss to be considered by a jury in determining damages where they are subject to a reasonable degree of certainty and not based solely on conjecture and speculation. Plaintiff offered testimony as to such loss based on profits of past years which is a legitimate method to use to establish future losses. Any inconsistencies between the testimony and the corporate records were explained, and the issue was presented to the jury.

4. Defendant sought to read selected portions of the deposition in question after the deponent had been excused as a witness. The trial court did not err in exercising its authority to exclude such evidence under those circumstances.

Affirmed.

1. SALES — ORAL DISTRIBUTORSHIP AGREEMENT — UNIFORM COMMERCIAL CODE — STATUTE OF FRAUDS — STATUTES.

An oral distributorship agreement which provides for an entitlement to purchase goods in the future without requiring a certain amount of goods to be purchased and which envisions an ongoing economic relationship between the parties for their mutual benefit is not a contract for the sale of goods subject to the statute of frauds of the Uniform Commercial Code (MCL 440.2201; MSA 19.2201).

2. SALES — UNIFORM COMMERCIAL CODE — STATUTES.

Article 2 of the Uniform Commercial Code applies to a present sale of existing and identified goods or to a contract in which the parties agree to the sale of goods at a future time (MCL 440.2105, 440.2106; MSA 19.2105, 19.2106).

3. SALES — UNIFORM COMMERCIAL CODE — DISTRIBUTORSHIP AGREE-
MENTS — STATUTES.

A distributorship agreement can constitute a valid contract for
the sale of goods under the provisions of Article 2 of the
Uniform Commercial Code where the parties so agree, even
though the quantity of goods involved is omitted (MCL
440.2204[3], 440.2306[1]; MSA 19.2204[3], 19.2306[1]).

4. CONTRACTS — BREACH OF CONTRACT — DUTY TO MITIGATE —
UNIFORM COMMERCIAL CODE — STATUTES.

A breach of contract imposes on a plaintiff a duty to mitigate
damages both generally and under the provisions of the Uni-
form Commercial Code, and a defendant bears the burden of
proving a failure to mitigate (MCL 440.2712, 440.2715; MSA
19.2712, 19.2715).

5. CONTRACTS — BREACH OF CONTRACT — MITIGATION OF DAMAGES —
CONSIDERATION BY JURY — ERROR.

A trial court does not commit reversible error where it allows the
issue of mitigation of damages in an action for breach of
contract to be considered by a jury after evidence of some
attempt to mitigate damages was presented.

6. CONTRACTS — BREACH OF CONTRACT — LOST PROFITS — CONSIDERA-
TION BY JURY — DAMAGES — REASONABLE CERTAINTY.

Lost profits resulting from a breach of contract are proper items
of loss to be considered by a jury in determining damages;
however, they must be subject to a reasonable degree of cer-
tainty and cannot be based solely on conjecture and specula-
tion, although they need not be determined to a mathematical
certainty.

7. CONTRACTS — BREACH OF CONTRACT — UNCERTAINTY OF DAMAGES
— ALLOCATION OF RISK.

Doubts as to the certainty of damages in an action for breach of
contract should be resolved against a wrongdoer rather than an
injured party.

8. CONTRACTS — BREACH OF CONTRACT — LOSS OF FUTURE PROFITS —
METHOD OF CALCULATION.

Profits earned in past years may be used legitimately to establish
future losses of profits due to a breach of contract.

9. CONTRACTS — BREACH OF CONTRACT — LOST PROFITS — TESTIMONY
BY INTERESTED PARTIES — RULES OF EVIDENCE.

An interested party is not disqualified from testifying as to profits

lost due to a breach of contract under the rules of evidence
(MRE 601).

10. CONTRACTS — BREACH OF CONTRACT — INCONSISTENCIES IN TESTI-
MONY — LOST PROFITS — CORPORATIONS — TAXATION.

An inconsistency between an interested party's testimony regard-
ing profits lost as a result of a breach of contract and figures in
the party's corporate books and records is explainable where
excess profits for a given year are paid to the party's corporate
officers as additional compensation at the end of the year to
avoid double taxation.

11. CONTRACTS — BREACH OF CONTRACT — LOST PROFITS — JURY
QUESTION.

A challenge by a defendant of the accuracy of a plaintiff's
testimony concerning profits lost as a result of a breach of
contract is a matter to be resolved by a jury.

12. EVIDENCE — DEPOSITIONS — EMPLOYEES OF PARTIES — COURT
RULES.

An employee's deposition may be used against a party by whom
the witness was employed at the time of the taking of the
deposition (GCR 1963, 302.4[2]).

13. EVIDENCE — EVIDENTIARY RULINGS — DEPOSITIONS — STANDARD
OF REVIEW — COURT RULES.

Evidentiary rulings by a trial court, including rulings concerning
the admissibility of depositions, will not be upset on appeal
absent an abuse of discretion (GCR 1963, 302.4).

14. COURTS — AUTHORITY TO EXCLUDE RELEVANT EVIDENCE — DEPOSI-
TIONS — RULES OF EVIDENCE.

A trial court has the authority to exclude relevant evidence
contained in a deposition where a party who used the deposi-
tion to impeach a witness seeks to read selected portions of the
deposition into the record after the deponent has been excused
as a witness (MRE 403).

*Lampert, Fried & Levitt, P.C.* (by *David M. Fried*
and *Philip G. Rosenberg),* for plaintiff.

*Clark, Klein & Beaumont* (by *J. Walker Henry*
and *James E. Baiers),* for defendant.

Before: T. M. BURNS, P.J., and R. M. MAHER and M. E. CLEMENTS,* JJ.

PER CURIAM. The defendant, American Standard, Inc., appeals as of right from a jury verdict in the Wayne County Circuit Court for $300,000 in favor of the plaintiff and a no cause of action on defendant's counterclaim.

The defendant is a major manufacturer of products in diversified areas. This action involves AMSTAN, defendant's heating and plumbing distribution division, which was phased out in 1972. Lorenz Supply Company (hereinafter Lorenz) is a family-owned local business which was primarily involved in selling pipes, valves, and fittings, known as "in the wall" plumbing items. In 1972, when Robert Lorenz heard that AMSTAN's Troy outlet was being phased out, he decided to acquire its plumbing fixtures such as wash bowls, faucets, etc., which are known as "out of the wall" items.

In negotiations with a local sales manager, Lorenz agreed to purchase $420,000 worth of plumbing inventory and to assume responsibility for defendant's outstanding delivery orders. In return, Lorenz was to be given a preferred distributorship of defendant's products in this area. The defendant assured Mr. Lorenz that it would use its best efforts to supply Lorenz with the products it needed. In reliance, Lorenz expanded its operations and hired additional personnel. Lorenz never received a formal distributorship agreement and was told it would be notified by letter. Mr. Lorenz received a letter dated September 6, 1972, in which he was welcomed as a distributor of defendant's products.

Transfer of the Troy inventory from the defen-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

dant to Lorenz commenced on August 14, 1972. Mr. Lorenz contends that he later discovered that some of the fastest selling items were removed from the Troy warehouse and shipped to other customers and distributors. Mr. Lorenz also contends that he was being billed for inventory which he never received or received bills which had incorrect figures and amounts. Mr. Lorenz testified at trial that he informed defendant of these problems, but was simply told to continue paying his account and that the problems would be taken care of later. As of November of 1973, Lorenz claimed that there was "extension" errors and "credit due" errors in his billings totaling $30,000. In addition, there existed a $42,000 difference between materials that Lorenz was billed for and the materials received. In December of 1973, Lorenz refused to pay the installment due of $65,000 because of the expected "set-off" of $72,000 in accumulated errors. Defendant informed Lorenz that if it did not pay, it would not recieve any more of defendant's products.

On January 21, 1974, Lorenz received a notice from the defendant that due to nonpayment of its account, it had been placed on "credit hold" and could only get merchandise by paying cash in advance. Lorenz obtained additional financing in order to comply with this edict, although it meant a loss of sales volume.

Although Lorenz was supposed to receive $420,-000 worth of inventory from the Troy warehouse, the company only received approximately $260,000 worth of goods, resulting in a loss of profits. Mr. Lorenz stated that he tried to secure additional inventory from other American Standard distributors. In April of 1974, Lorenz was informed by defendant's representative that it was being cut off

from all of American Standard's products and received a cancellation letter in June of 1974. Lorenz was left with a quarter million dollars of "dead inventory"—inventory which Lorenz could not sell because it had no access to related products. Lorenz filed a Chapter XI bankruptcy in March of 1975. At the time of trial, Lorenz was a defunct corporation.

In January of 1974, Lorenz filed a breach of contract action against the defendant seeking $2,000,000 in damages. The complaint was amended in 1976 to allege, *inter alia,* the following: breach of a written agreement to sell plaintiff a portion of the AMSTAN inventory from the Troy warehouse and breach of an oral distributorship agreement by refusing to sell plaintiff merchandise, which forced plaintiff into bankruptcy. The defendant denied all of the allegations and counterclaimed for amounts due for purchases of plumbing fixtures in the amount of $71,968.22.

A jury trial was held in May of 1978 in the Wayne County Circuit Court. The jury returned a verdict of $45,000 for plaintiff on the breached inventory sales agreement and $225,000 for the breached distributorship agreement. The jury returned a verdict of no cause of action on defendant's counterclaim. The defendant filed a motion for a judgment notwithstanding the verdict or, in lieu thereof, a new trial. The trial court granted a new trial on defendant's counterclaim only. The parties then stipulated to judgment on the counterclaim in favor of defendant in the amount of $69,873.40 plus interest.

The first issue on appeal involves the enforceability of the oral distributorship agreement.

The UCC Statute of Frauds § 2-201 is embodied in MCL 440.2201; MSA 19.2201 and provides in pertinent part as follows:

"Sec. 2201. (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

The defendant contends that the oral distributorship agreement was, in effect, a contract for the sale of goods, and, as such, unenforceable for lack of a sufficient writing. The plaintiff argues, and the trial court held, that the UCC provision was not applicable to the oral distributorship agreement. There are no Michigan cases on this issue, making this an issue of first impression.

MCL 440.2102; MSA 19.2102 states that "this article applies to transactions in goods". MCL 440.2105(1); MSA 19.2105(1) defines goods as all things which are "movable at the time of identification to the contract for sale". MCL 440.2105(2); MSA 19.2105(2) provides:

"Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell."

A contract to sell is further explained in MCL 440.2106(1); MSA 19.2106(1) as follows:

"In this article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the

passing of title from the seller to the buyer for a price (section 2401). A 'present sale' means a sale which is accomplished by the making of the contract."

To summarize these provisions, the code applies to a present sale of existing and identified goods or to a contract where the parties agree to the sale of goods at a future time. In the instant case, Lorenz was granted the status of a "preferred distributor" who would be entitled to purchase plumbing fixtures manufactured by the defendant in the future. The agreement did not require Lorenz to buy a certain quantity of goods or, indeed, to buy *any* goods from the defendant in the future. This agreement envisioned an ongoing economic relationship between Lorenz and defendant for their mutual benefit, rather than a contract of sale. Thus, we conclude that the trial court was correct in ruling that the UCC did not apply, and Lorenz was not precluded from asserting the oral distributorship agreement by operation of the Statute of Frauds.

Assuming, *arguendo,* that we had found the UCC applicable to this type of agreement, our conclusion would have been the same.

First of all, Lorenz never undertook to buy any of defendant's products, so the $500 statutory amount was never triggered. Furthermore, the September 6, 1972, letter from defendant's vice-president, Bren O'Connell, to Lorenz was a sufficient written memorandum of the previous oral agreement to satisfy the requirements of MCL 440.2201; MSA 19.2201. The letter, in its entirety, provides:

"Dear Bob:
"Now that you have officially joined the family of American Standard distributors, I want to record with

you my extreme happiness with the way our whole negotiations turned out with regard to your purchase of the Amstan inventory and, more importantly, to welcome you to the numbers of American Standard distributors across the country.

"Ed and I are most enthusiastic about your ability to help us participate in larger measure in the Detroit market and I hope the opportunity will soon present itself when I can express my sincerest welcome to those other Lorenz personnel who I have not yet met but on whom we are counting for the strongest possible support in a very difficult market.

"It is a pleasure to have you with us and I trust that our association will be mutually beneficial for many years to come.

"Sincerely yours,
"Bren O'Connell."

Although the quantity term is omitted, in the context of a distributorship agreement such an indefiniteness is inherent to the relationship and would not defeat the validity of the contract where the parties agreed. See MCL 440.2204(3); MSA 19.2204(3), MCL 440.2306(1); MSA 19.2306(1).

The defendant contends that the trial court erred in submitting the issue of damages on the distributorship agreement to the jury where plaintiff made no attempt to mitigate damages by seeking "cover".

MCL 440.2712; MSA 19.2712 provides in pertinent part:

"(1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or conse-

quential damages as hereinafter defined (section 2715), but less expenses saved in consequence of the seller's breach."

A buyer's incidental and consequential damages are explained in MCL 440.2715; MSA 19.2715, as follows:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
"(2) Consequential damages resulting from the seller's breach include
"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
"(b) injury to person or property proximately resulting from any breach of warranty."

Although we have previously held that the UCC was not applicable to the distributorship agreement herein, we find it to be a useful framework on which to analyze the issue of mitigation of damages. Even outside the code, a breach of contract imposes on the plaintiff a duty to mitigate damages. The defendant bears the burden of proving a failure to mitigate. See *Williams v American Title Ins Co,* 83 Mich App 686, 697; 269 NW2d 481 (1978), *Froling v Bischoff,* 73 Mich App 496, 499; 252 NW2d 832 (1977), *Rich v Daily Creamery Co,* 296 Mich 270, 282; 296 NW 253 (1941), *Reinardy v Bruzzese,* 368 Mich 688, 691; 118 NW2d 952 (1962).

In the instant case, the plumbing fixtures produced by defendant were not the type of unique

goods, such as a particular type of automobile, which could not have been obtained elsewhere. There was no testimony that Lorenz sought to obtain comparable items from other manufacturers. However, Mr. Lorenz did testify that he sought to obtain defendant's plumbing fixtures from other American Standard distributors. Since there was some attempt to mitigate, it was not reversible error to allow the issue to go to the jury. The trial court instructed the jury on the mitigation issue as follows:

"Now, with respect to mitigation of damages spoken of. By mitigation we are talking of reduction of damages. Generally, the defendant has the burden of proving any failure on the part of the plaintiff to mitigate his damages. However, if you find from the proofs offered by plaintiff that there was failure to mitigate the damages, then you should not assess that portion of the damages which were not mitigated against the defendant."

The plaintiff sought to recover $650,000 for losses due to the breached distributorship agreement. The jury awarded plaintiff $250,000. The significant reduction in the recovery may well be attributed to a finding by the jury that plaintiff failed to mitigate damages. We decline to invade the province of the jury on this issue.

The defendant's next allegation is that the trial court erred reversibly by allowing the jury to consider lost profits with respect to the distributorship agreement where this item of loss was entirely speculative and based on conjecture.

Lost profits resulting from a breach of contract are proper items of loss to be considered by a jury in determining damages. However, lost profits must be subject to a reasonable degree of certainty

and cannot be based solely on conjecture and speculation. This does not imply that lost profits must be determined to a mathematical certainty. Even where lost profits are difficult to calculate, and are speculative to some degree, they are still allowed as a loss item. See *Wolverine Upholstery Co v Ammerman,* 1 Mich App 235, 244; 135 NW2d 572 (1965), *Fister v Henschel,* 7 Mich App 590, 595-596; 152 NW2d 155 (1967), *Valley Die Cast Corp v A C W Inc,* 25 Mich App 321, 334-336; 181 NW2d 303 (1970), *Allen v Michigan Bell Telephone Co,* 61 Mich App 62, 68-69; 232 NW2d 302 (1975), *National Pharmaceutical Services, Inc v Harrison Community Hospital,* 67 Mich App 286, 293-294; 241 NW2d 76 (1976), *Lawton v Gorman Furniture Corp,* 90 Mich App 258, 269-271; 282 NW2d 797 (1979), *Allis v McLean,* 48 Mich 428, 432-433; 12 NW 640 (1882), *Isbell v Anderson Carriage Co,* 170 Mich 304, 317-319; 136 NW 457 (1912), *Stimac v Wissman,* 342 Mich 20, 28; 69 NW2d 151 (1955), *The Vogue v Shopping Centers, Inc (After Remand),* 402 Mich 546; 266 NW2d 148 (1978).

Furthermore, Michigan case law indicates that doubts as to the certainty of damages must be resolved against the wrongdoer. In *Howard v City of Melvindale,* 27 Mich App 227, 235; 183 NW2d 341 (1970), this Court said:

"On the principle that where a litigant can show he has been damaged, but his damages cannot be measured with certainty, that it is better that he recover more than he is entitled to than less, the rule in Michigan is that the risk of the uncertainty is cast upon the wrongdoer, not the injured party. *Routsaw v McClain* (1961), 365 Mich 167, 171."

See also *Godwin v Ace Iron & Metal Co,* 376 Mich

360, 369; 137 NW2d 151 (1965), *Wolverine, supra,*
244 ("It is the uncertainty as to the *fact* of legal
damages that is fatal to recovery, but not uncer-
tainty as to the amount").

Mr. Lorenz testified as to his company's loss of
profits due to the breach, based on profits in past
years. This is a legitimate method to establish
future losses. *National Pharmaceutical Services,
Inc, supra, Fera v Village Plaza, Inc,* 396 Mich
639, 644; 242 NW2d 372 (1976). Mr. Lorenz was
not disqualified because he is an interested party
from testifying as to the lost profits under MRE
601. See also, *Taylor v Michigan Power Co,* 45
Mich App 453, 456-457; 206 NW2d 815 (1973),
*Hetler v Holtrop,* 285 Mich 570, 575; 281 NW 434
(1938).

Defendant poses a more serious objection to Mr.
Lorenz's testimony on lost profits where it was
inconsistent with the figures in the corporate
books and records. Mr. Lorenz explained the dis-
crepancy by saying that some of the company's
excess profits were paid to corporate officers at the
end of the year as additional compensation in
order to avoid double taxation. This is a legitimate
accounting technique used by closely-held corpora-
tions to reduce tax liability, since excess profits
which are paid out as dividends are subject to a
corporate tax.

In *Swaney v Derragon,* 281 Mich 142, 143; 274
NW 741 (1937), the Supreme Court indicated that
"profit" may be calculated in several ways. In any
event, where a defendant disputes the accuracy of
the plaintiff's testimony concerning lost profits,
that matter is a question to be resolved by the
jury. *National Pharmaceutical Services, Inc, supra,*
294. In the instant case, defense counsel empha-
sized the variance between Lorenz's trial testi-

mony and the corporate records in his closing argument. The jury had this issue before it, and we will not reverse the judgment on this basis.

Defendant claims that the trial court erred reversibly in refusing to allow defendant to use Mr. Dempsey's deposition in its case in chief. Mr. Dempsey was the manager of the Troy branch of American Standard. When the inventory was sold to Lorenz, Dempsey was hired by the plaintiff. The deposition was taken on April 19, 1975, while Dempsey was still in the plaintiff's employ. Plaintiff sought to call Dempsey as an adverse witness pursuant to GCR 1963, 507.4. In response to defendant's objection, the trial court ruled that Dempsey could be called as a witness, but that he was not an adverse witness. Later in the proceedings, defense counsel sought to introduce certain portions of Dempsey's deposition under GCR 1963, 302.4. The trial court ruled that the deposition could not be read into evidence, as the witness had been employed by both parties and that, since plaintiff had been precluded from calling him as an adverse witness, it would be unfair to allow defendant to use his deposition.

GCR 1963, 302.4 provides in pertinent part:

"Use of Depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any 1 of the following provisions:

*  *  *

"(2) The deposition of a party or anyone who at the time of the transaction or occurrence out of which the action arose or at the time of taking the deposition was

an officer, director, employee, or agent of any party may be used by an adverse party for any purpose."

This court rule indicates that an employee's deposition may be used against a party by whom this witness was employed "at the time of the taking". The obvious rationale is that any damaging statements made by the employee are reliable, since he is risking the reprisal of his employer in making them. The trial court's ruling would not have been unfair or inconsistent if it had found that Dempsey was not adverse to the plaintiff and that his deposition with the damaging admissions could be used by the defendant.

Evidentiary rulings by the trial court will not be upset absent abuse of discretion. This rule applies to rulings concerning the admissibility of depositions pursuant to GCR 1963, 302.4. *Socha v Passino*, 405 Mich 458, 471; 275 NW2d 243 (1979), *Moldovan v Allis Chalmers Manufacturing Co*, 83 Mich App 373, 382; 268 NW2d 656 (1978). It should further be noted that MRE 403 gives the trial courts the authority to exclude relevant evidence under certain circumstances.

In the instant case, Dempsey testified at trial. The defendant used the deposition in question for impeachment purposes. After the witness was excused, defendant sought to read selected portions of the deposition. We find that this situation is controlled by the ruling in *Moldovan, supra*, 382-383, which states:

"[P]laintiff complains he should have been allowed to read selected portions of depositions of witnesses who had already testified and had been excused. The record indicates the judge denied plaintiff's request since plaintiff should have cross-examined the witnesses about their deposition statements when they were on the

stand rather than wait until they were excused to read selected highlights from the deposition. Plaintiff claims GCR 1963, 302.4(2) allows the use of depositions 'for any purpose'. We do not think this broad language removes the trial judge's control of the proceedings and we conclude the trial judge properly refused to let plaintiff's counsel introduce favorable excerpts of deposition testimony after the witnesses were excused."

Based on the foregoing, we do not find this ruling to constitute reversible error.

We have examined the remainder of defendant's issues and decline to discuss them, as they do not constitute a basis for reversal.

Affirmed.