**O'SULLIVAN CORPORATION, Plaintiff–Appellee,**

v.

**DURO–LAST, INC. and Plastatech Engineering, Ltd., Defendants– Appellants.**

**Nos. 99–2190, 99–2373, 00–1521.**

United States Court of Appeals, Sixth Circuit.

March 28, 2001.

---

Before DAUGHTREY and GILMAN, Circuit Judges; and COLLIER, District Judge.*

GILMAN, Circuit Judge.

This is a diversity of citizenship action brought by O'Sullivan Corp., a vinyl manufacturer, against Duro–Last, Inc., a company that trims and welds roofing materials, and Plastatech Engineering, Ltd., a manufacturer of reinforced vinyl roofing material, for breach of an alleged exclusive-requirements contract. After a bench trial, the district court awarded damages to O'Sullivan, but deferred its ruling on prejudgment and post-judgment interest until after the appeal was decided. Duro–Last and Plastatech now appeal the award of damages. O'Sullivan cross-appeals, arguing that the district court erred in deferring its determination of applicable inter-

est on the amount due. For the reasons set forth below, we AFFIRM the judgment of the district court with respect to the award of damages, and REMAND the case for the calculation of prejudgment and post-judgment interest due O'Sullivan.

## I. BACKGROUND

### A. Factual background

The key questions in this case are whether a requirements contract existed between O'Sullivan, on one hand, and Duro–Last and Plastatech, on the other, and, if so, what damages are owed to O'Sullivan as a result of that contract being breached. O'Sullivan is a corporation headquartered in Winchester, Virginia. Duro–Last and Plastatech are "sister" companies located in Saginaw, Michigan that are co-owned by the same investors. The two companies use vinyl sheeting to manufacture and supply roofing material to the commercial roofing industry. In 1995, John Greko, Vice President of Engineering for Duro–Last, asked James Tremoulis, the Vice President of Sales and Marketing for O'Sullivan, to provide quotes for 0.0120, 0.0155, and 0.0205–gauge vinyl sheeting in various colors that would be manufactured according to the Duro–Last formula. At that time, Canadian General Tower, Ltd. (CGT) was Plastatech's sole supplier of vinyl. Duro–Last and Plastatech, however, sought to eventually operate their own "calender," a machine that produces vinyl.

Although Tremoulis's initial quotations were rejected as too high, the parties continued to negotiate. During a February 15, 1996 meeting with numerous company representatives, James Holland, President of O'Sullivan, met privately with John

* The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Burt, President of Duro–Last and CEO of Plastatech. Holland asked Burt to name a price based on O'Sullivan providing 100% of the vinyl needed by Duro–Last and Plastatech. When Burt provided a price acceptable to Holland, they shook hands and announced their agreement to the rest of the members at the meeting. Duro–Last and Plastatech, however, now claim that no exclusive-requirements commitment was made and that any commitment was conditioned on O'Sullivan meeting their quality requirements.

On February 27, 1996, Tremoulis sent a letter to Kathy Allen. President of Plastatech, stating that "you are aware that we have adjusted our selling price to Duro–Last Roofing, Inc. based on O'Sullivan Corporation supplying 100% of your vinyl requirements." After providing price quotes and a calender-training-program proposal to Duro–Last, the letter concluded: "We appreciate the opportunity to supply your vinyl requirements and look forward to a long term continually growing business relationship between our companies." The letter also called for O'Sullivan, Duro–Last, and Plastatech to draft and execute a Support and Assistance Agreement, which was subsequently executed by the companies on April 1, 1996.

Duro–Last and Plastatech sent O'Sullivan various purchase orders in March and April of 1996, including a blanket purchase order for the period from April 12, 1996 through the week of July 5, 1996, using the prices set forth in the February 27, 1996 letter. All of these purchases were for white vinyl. On April 10, 1996, O'Sullivan sent a letter to Duro–Last requesting that Duro–Last provide purchase projections and place qualifying orders for gray and tan materials. Unbeknownst to O'Sullivan, Duro-last was continuing to purchase these colored vinyls from CGT.

Allen told Tremoulis on May 8, 1996 that CGT had contacted her and had of-fered a lower price. Tremoulis reminded Allen, during the May 8, 1996 conversation and in later conversations, that they had entered into a fixed-price requirements contract and that O'Sullivan would not reduce the price of its vinyl. On May 9, 1996, the day after O'Sullivan refused to lower its vinyl price, Duro–Last and Plastatech began to complain about the quality of O'Sullivan's vinyl. Allen alleged that O'Sullivan's most recent shipment of white vinyl was actually colored yellow, and asked O'Sullivan to switch its vinyl-production formula from a mixed-antimony/zinc borate formula to an all-antimony formula. O'Sullivan, however, had only begun using the mixed-antimony/zinc borate formulation upon the request of Duro–Last and Plastatech. Indeed, Allen later asked O'Sullivan to return to the mixed-antimony/zinc borate formulation.

During May and June of 1996, O'Sullivan representatives met with Duro–Last and Plastatech to discuss various alleged production problems. O'Sullivan resolved these problems by issuing credits to Duro–Last and Plastatech, even though it disputed the legitimacy of the complaints. Duro–Last and Plastatech made no complaints in July, but Allen called O'Sullivan in mid-August to complaint that O'Sullivan's vinyl was charring when welded on roofs. This charring was allegedly caused by a particular zinc borate ingredient used by O'Sullivan in manufacturing the vinyl. The use of this ingredient, however, was actually specified by Duro–Last, not O'Sullivan, because zinc borate was part of the Duro–Last formula. Duro–Last and Plastatech even specifically approved the particular brand of zinc borate used by O'Sullivan. O'Sullivan nevertheless switched back to another formula given by Duro–Last that did not contain zinc borate. The material that was produced by this formula was shipped on August 17, 1996 and ap-

proved by a Duro–Last chemist on August 20, 1996.

Before Duro–Last and Plastatech would accept this last delivery, Allen told Tremoulis that she needed to wait for final approval from Greko. Plastatech then ordered O'Sullivan in late August of 1996 to stop production pending further instructions, after attempting to negotiate additional credits for alleged problems with charring. No further purchase orders were ever received by O'Sullivan.

During their entire course of dealings, Duro–Last and Plastatech never told O'Sullivan that it was not their sole supplier. By November of 1996, Duro–Last began operating its own calender with the assistance of O'Sullivan and by January of 1997 no longer purchased vinyl from any outside source.

### B. Procedural background

O'Sullivan filed suit against Duro–Last and Plastatech on December 23, 1996, alleging that the two defendants had breached their agreement to purchase all of their gray, tan, and white vinyl requirements from O'Sullivan until Duro–Last's own calender came on-line. A bench trial was held over several days between April 23 and June 4, 1998. On September 28, 1999, the district court filed its decision, concluding that the parties had entered into an oral requirements contract at their February 15, 1996 meeting and that the February 27, 1996 letter memorialized the contract.

The district court also found that the complaints of Duro–Last and Plastatech about the quality of O'Sullivan's material were without merit, observing that the vast majority of the allegedly defective material for which O'Sullivan issued credits was actually in conformity with the parties' contract. In particular, the court found that only 5,000 out of the 275,000 yards of vinyl that were alleged to be under-gauged were actually under gauge, and then only by the slightest of margins, and that Duro–Last's and Plastatech's complaints about the color and charring of the vinyl were unsubstantiated. The district court also found that Duro–Last and Plastatech led O'Sullivan to believe that production would continue.

Accordingly, the district court concluded that Duro–Last and Plastatech had breached the contract. It determined that O'Sullivan was due $397,638 for the vinyl that was supplied to Duro–Last and Plastatech but not paid for, imposed the contractual service charge of 1.5% per month on the outstanding balance, and awarded $3,161,573 for O'Sullivan's loss of profits and overhead incurred by the breach. The judgment, however, did not provide any assessment of prejudgment or post-judgment interest.

Duro–Last and Plastatech filed their notice of appeal on October 8, 1999. O'Sullivan moved to amend the judgment to provide for the assessment of prejudgment and post-judgment interest, as mandated by state and federal statutes. The district court, however, declined to decide the applicable interest rate and service charges until after appellate review. O'Sullivan filed a notice of cross-appeal with respect to the interest.

## II. ANALYSIS

### A. Standard of review

■ We will not set aside the district court's findings of fact unless we find them to be clearly erroneous. See Fed.R.Civ.P. 52(a); *United States v. Clay,* 117 F.3d 317, 320 (6th Cir.1997). A district court's factual findings are clearly erroneous if, based on the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Bartling v. Fruehauf Corp.,* 29 F.3d 1062, 1067 (6th

Cir.1994) (citations and internal quotation marks omitted). Even greater deference is required when reviewing the credibility determinations of a district court. *See id.*

■■■ Contract interpretation is a question of law and is subject to de novo review. *See Ferro Corp. v. Garrison Indus., Inc.,* 142 F.3d 926, 931 (6th Cir.1998) (citations omitted). Michigan courts have held that a trial court's interpretation of the Michigan prejudgment interest statute is a question of law, which is also reviewed de novo. *See Perceptron, Inc. v. Sensor Adaptive Machs., Inc.,* 221 F.3d 913, 922–23 (6th Cir.2000) (citing *Attard v. Citizens Ins. Co.,* 237 Mich.App. 311, 602 N.W.2d 633, 637 (Mich.Ct.App.1999)).

B. Breach of the requirements contract by Duro–Last and Plastatech

Duro–Last and Plastatech raise two challenges to the district court's finding that they breached a requirements contract with O'Sullivan. They first contend that the oral agreement made between the parties was not confirmed in writing and, therefore, that the Statute of Frauds renders any such agreement unenforceable. Then they argue that, even if a written confirmation of the oral agreement existed, O'Sullivan waived its right to recover under the contract through its subsequent actions.

■■■ Ample testimony supports the district court's finding that an agreement had been reached, and that this agreement was characterized as a "requirements" contract by the parties themselves. Taking the record as a whole, we conclude that the district court committed no error in finding that Duro–Last and Plastatech agreed during the February 15, 1996 meeting to buy 100% of their vinyl requirements from O'Sullivan. But Duro–Last and Plastatech argue that their agreement was oral, not written. Under the Statute of Frauds, a contract for the sale of goods with a value over $500 is not enforceable without a signed writing sufficient to evidence the contract. *See* Mich. Comp. Laws § 440.2201(1). Duro–Last and Plastatech contend that the Statute of Frauds bars recovery on the agreement because the parties failed to create a signed, written contract at the February 15, 1996 meeting.

Merchants such as O'Sullivan, Duro–Last, and Plastatech, however, may satisfy the requirements of the Statute of Frauds through an oral agreement "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, ... unless written notice of objection to its contents is given within 10 days after it is received." Mich. Comp. Laws § 440.2201(2). The district court found that the letter of February 27, 1996 constituted such a confirmatory memorandum between the parties. Duro–Last's and Plastatech's failure to object to the letter within ten days, therefore, meant that O'Sullivan could enforce the requirements contract.

Duro–Last and Plastatech also argue that the letter simply indicated the continuation of negotiations, rather than the confirmation of any agreement. Specifically, they point to the use of the words "proposal" in the letter, the fact that the letter stated that the selling price was adjusted "since" the February 15 meeting, and Tremoulis's testimony that in the absence of a purchase order, O'Sullivan would not have produced any vinyl for Plastatech. Duro–Last and Plastatech argue that these circumstances indicated that negotiations between the parties were still continuing.

Under Michigan law, however, the fact that the writing is ambiguous with respect to some of its terms is not enough to render the agreement unenforceable under the Statute of Frauds. *See Matter of Es-*

*tate of Frost,* 130 Mich.App. 556, 344 N.W.2d 331, 334 (Mich.1983) (holding that a written agreement to remove trees satisfied the Statute of Frauds, even though the parties failed to describe the parcel of land upon which the trees were to be cut). Rather, the determination of whether a writing satisfies the Statute of Frauds is a question of fact. *See West Cent. Packing, Inc. v. A.F. Murch Co.,* 109 Mich.App. 493, 311 N.W.2d 404 (Mich.1981). These findings of fact, in turn, are analyzed under the "clearly erroneous" standard. *See United States v. Clay,* 117 F.3d 317, 320 (6th Cir.1997).

Using this standard, we conclude that the district court did not err in finding that the February 27, 1996 letter constituted a confirmatory memorandum. The letter satisfied all of the requirements for such a memorandum under Michigan law. It was sent between merchants, referred specifically to the February 15, 1996 meeting during which the requirements contract was reached, provided detailed product descriptions and prices, confirmed that the agreement was based on O'Sullivan's supplying 100% of Duro–Last's and Plastatech's vinyl requirements, and was signed by Tremoulis on behalf of O'Sullivan. *See Lorenz Supply Co. v. American Standard, Inc.,* 100 Mich.App. 600, 300 N.W.2d 335, 338–39 (Mich.Ct.App.1980) (holding that an oral agreement that Lorenz was to become an American Standard distributor was confirmed by a letter signed and sent by the vice president of American Standard, welcoming Lorenz "to the numbers of American Standard distributors across the country"). In addition, Tremoulis testified that the use of the word "proposal" in the letter was a word-processing mistake, resulting from his use of the letter format from prior correspondence. We consequently accept the district court's findings that O'Sullivan could enforce its requirements contract with Duro–Last and Plastatech because the letter of February 27, 1996 satisfied the Statute of Frauds.

■ Duro–Last and Plastatech next argue that even if the letter satisfied the Statute of Frauds, that O'Sullivan had waived its right to enforce the contract. Their argument is based on Allen's testimony that, during a June 1996 meeting at Plastatech, Tremoulis observed a CGT truck unloading materials. Tremoulis, however, stated: "I have no recollection at all of ever seeing CGT trucks that day." But Duro–Last and Plastatech point out that Allen testified that when Tremoulis asked her whether Plastatech was buying materials from CGT, she informed him that Plastatech was indeed doing so.

The district court, however, found Allen's testimony to be "less than fully credible and inconsistent with her ... prior statements and testimony." As this court has stated, "however we might individually view the evidence if we were the triers of fact, it is clear that we are required to give great weight to the findings of the trial court which had the opportunity to see the witnesses, to weigh their evidence as it was presented, to view the demeanor of the persons who testified in court, and to determine all issues of credibility." *Ramsey v. United Mine Workers.,* 481 F.2d 742, 747 (6th Cir.1973). Given this high degree of deference, we find no error in the district court's evaluation of Allen's testimony as less than fully credible.

Further, even if Tremoulis did observe a CGT delivery truck at the Plastatech site, his reaction demonstrated no intention to relinquish O'Sullivan's right to enforce the requirements contract. As Allen acknowledged in her testimony, Tremoulis's alleged statements to Allen concerning the CGT truck were consistent with a reaction of surprise and protest regarding the delivery. Allen's testimony, therefore, fails to contradict the district court's finding

that O'Sullivan did not waive its right to enforce the requirements contract.

■ Waiver requires more than an awareness of a breach. *See Hall v. Gargaro,* 310 Mich. 693, 17 N.W.2d 795, 797 (Mich.1945) (finding that a party's failure to insist immediately on damages stipulated in a contract did not mean that he waived his claim to those damages where there was no proof that he "agreed to a change in this plain requirement in the written contract"). Instead, waiver requires either the "actual intention to relinquish" a known right, or conduct that would warrant such an inference. *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.,* 234 Mich.App. 550, 595 N.W.2d 176, 184 (Mich.Ct.App.1999).

Here, there was no showing that O'Sullivan ever intended to waive its rights to be the sole supplier for Duro–Last's and Plastatech's vinyl requirements. When Allen told O'Sullivan about CGT's lower price offer, Tremoulis and Holland insisted that the contract required Duro–Last and Plastatech to purchase vinyl from O'Sullivan at the prices agreed on originally. O'Sullivan also repeatedly requested that Duro–Last and Plastatech furnish orders for these materials, even though O'Sullivan never received an order for grey or tan vinyl. Finally, the alleged single sighting of a CGT delivery truck at Plastatech by one of O'Sullivan's officers was found by the district court to be more consistent with surprise and protest than with waiver. Given this record, it is reasonable for the district court to have found that O'Sullivan did not waive its right to be the sole vinyl supplier for Duro–Last and Plastatech. We therefore affirm the district court's determination that Duro–Last and Plastatech breached an enforceable requirements contract with O'Sullivan.

## C. Award of damages

■ Duro–Last and Plastatech argue that even if this court affirms O'Sullivan's claim for breach of contract, that the district court improperly calculated the amount of O'Sullivan's damages. They point out that, under Michigan law, lost profits must be proven "to a reasonable degree of certainty and cannot be based solely on conjecture and speculation." *DXS, Inc. v. Siemens Med. Sys., Inc.,* 100 F.3d 462, 473 (6th Cir.1996) (citations and internal quotation marks omitted). Duro–Last and Plastatech raise the following four challenges to the district court's determination of O'Sullivan's lost profits: (1) O'Sullivan lacked the capacity to produce the additional vinyl represented by the CGT sales, (2) O'Sullivan improperly inflated its projected profit margin, (3) the district court improperly treated O'Sullivan's labor costs as fixed costs, and (4) O'Sullivan failed to mitigate its damages. We will address each of these challenges in turn.

### 1. O'Sullivan's production capacity

Duro–Last's and Plastatech's argument that O'Sullivan lacked the capacity to accommodate their sales was not raised below. In general, this court has declined to review arguments not presented originally to the district court. *See Taft Broad. Co. v. United States,* 929 F.2d 240, 243 (6th Cir.1991) (reiterating "the principle that issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance."). We find no justification to depart from this general principle in the present case. Furthermore, for what it is worth, we find no merit to Duro–Last's and Plastatech's argument regarding O'Sullivan's alleged lack of capacity.

## 2. O'Sullivan's labor costs

■ Under Mich. Comp. Laws § 440.2708(2), the measure of a seller's profit may be calculated by taking "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages . . ., [after] due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." "Overhead" refers to the fixed and continuous expenses of a business that remain the same regardless of a particular contract. *See Jetz Serv. Co., Inc. v. Salina Props.*, 19 Kan.App.2d 144, 865 P.2d 1051, 1058 (Kan.Ct.App.1993). In contrast to overhead, variable costs must be deducted from the contract price because they are costs that would have been saved as a result of the buyer's breach. *See Durasys, Inc. v. Leyba*, 992 F.2d 1465, 1470 (7th Cir.1993).

In its analysis of lost profits and overhead, the district court categorized some of O'Sullivan's labor costs as overhead and some as variable. O'Sullivan's Calender 3 was operating at full capacity before, during, and after the period when O'Sullivan was supplying vinyl to Duro–Last and Plastatech. If Duro–Last and Plastatech had fully complied with the contract, O'Sullivan would have had to shift some of its workers to Calender 2. The district court's calculation recognized as a variable cost the incremental direct labor cost that O'Sullivan would have incurred in shifting workers to Calender 2. Labor on Calender 3, however, was treated as a fixed cost, because the court found that these expenditures would not have changed even if Duro–Last and Plastatech had not breached the contract.

Duro–Last and Plastatech challenge this treatment of Calender 3's labor costs, arguing that, as a matter of law, allocation must be made for the direct labor which would have been required to produce the additional volume attributable to the CGT sales. Any failure to allocate increased labor costs, they argue, is at odds with the law. By treating as a variable cost the incremental direct labor cost that O'Sullivan would have incurred in shifting its workers to Calender 2, however, the district court did allow for the direct labor which would have been required to produce the additional volume attributable to CGT sales.

Duro–Last and Plastatech nevertheless argue that some additional allocation was required. They urge us to follow the reasoning of the First Circuit in *Teradyne, Inc. v. Teradyne Indus., Inc.*, 676 F.2d 865, 870 (1st Cir.1982), where the court vacated a judgment that involved no deduction for the work of product testers. *Teradyne* involved a buyer's breach of a contract to purchase a single unit of a $98,000 transistor-testing system. The court in that case stated that "the work of those [product testers] entered as directly into producing and supplying the [product] as did the work of a fabricator of [the product]," even though the testers' wages "would not have been affected if each of the testers, etc. handled one product more or less." *Id.* at 870. Salaries of the product testers, but not those of the fabricators, had been treated by the district court as overhead. The First Circuit remanded the case with respect to the direct labor costs so that the parties could offer further evidence regarding those costs.

*Teradyne* involved a wholly different production process than the case at hand. Even though the workers' wages in *Teradyne* were not based on the number of systems on which they worked, the workers fabricated and tested each individual system to order. Thus, the First Circuit reasonably found that the testers entered directly into the production of each system and that the company could have incurred

a marginal increase in its overall payment to its testers, even if their hourly wages remained the same.

In contrast to *Teradyne*, the workers in this case did not process individual vinyl sheets, but, rather, were involved in the operation of the calender that mass-produced the vinyl. The district court specifically found that O'Sullivan's labor force would not change as a result of producing the Duro–Last/Plastatech product and that, regardless of how much more material O'Sullivan would have been asked to produce, the labor costs for Calender 3 were fixed because O'Sullivan was already paying its workers to run the calender to produce vinyl for other companies.

Because the labor costs associated with Calender 3 did not vary based on the direct production of the vinyl, it was reasonable for the district court here to treat these labor costs as fixed. *See Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir.1967) (allowing the recovery of executive and clerical salaries, property taxes, and other general administrative expenses as part of the plaintiff's overhead). Furthermore, as discussed earlier, the district court recognized as a variable cost the incremental direct labor cost that O'Sullivan would have incurred in shifting its workers to Calender 2. We therefore find no error in the district court's treatment of O'Sullivan's labor costs in calculating the damages due O'Sullivan.

### 3. Profit margin

■ Duro–Last and Plastatech also challenge the calculation of damages as inflated, arguing that O'Sullivan's 37% margin for profit and overhead was inconsistent with certain O'Sullivan pricing documents that describe O'Sullivan's average profit margin as 2.2% to 15.58%. The comparison between the 37% profit and overhead margin and the pricing documents' "profit margins" is inapt, however, because

the 37% figure covers both profit *and* overhead.

Additionally, O'Sullivan explained that the figures contained in the documents were estimates made prior to the actual production of the Duro–Last/Plastatech product, suggesting that any contradictions resulted from the inaccuracy of the earlier estimates rather than any miscalculation on the part of the district court. This explanation is reasonable, given that O'Sullivan's production of the Duro–Last/Plastatech product turned out to be much more efficient than production for its other products. For example, although O'Sullivan first estimated the processing of 60,000 pounds of material per day based on its experience with other products, the actual processing of the Duro–Last/Plastatech product turned out to be around 120,000 pounds per day. Such drastic improvements made it probable that the initial estimates grossly underestimated the profit margin. We consequently find no error in the district court's use of the 37% margin for profit and overhead.

### 4. Mitigation of damages

■ Finally, Duro–Last and Plastatech argue that O'Sullivan should have mitigated its damages by accepting the business of other customers during 1996, rather than turning the customers away. But O'Sullivan's turning away of other business was directly caused by Duro–Last and Plastatech, who did not notify O'Sullivan that they were terminating the contract until November of 1996. O'Sullivan did not realize that there was any breach to mitigate until it was informed of Duro–Last's and Plastatech's refusal to order further materials. Once it did realize that Duro–Last and Plastatech were reneging on the requirements contract, O'Sullivan offered discounted prices to any customers

it could find in an effort to fill its open capacity. Accordingly, Duro–Last and Plastatech have failed to demonstrate that O'Sullivan ignored its duty to reasonably mitigate its damages. *See Lillard v. Kentucky Distilleries & Warehouse Co.*, 134 F. 168, 178 (6th Cir.1904) (holding that the burden is on the wrongdoer to show that the damages were mitigated or might have been mitigated by the plaintiff).

D. Deferring of the prejudgment and post-judgment interest calculations

O'Sullivan requested that it be awarded prejudgment and post-judgment interest three times – first, during its post-trial summations; second, in a timely Rule 59(e) motion to clarify the judgment by alteration or amendment; and finally, in a motion for the district court to rehear the dismissal of O'Sullivan's motion to clarify the judgment. Because these earlier requests were rejected by the district court, O'Sullivan again seeks the award of interest in its cross-appeal. O'Sullivan urges us to award it prejudgment interest at the rate of 12% per annum from the date it filed the complaint to the date of judgment, and post-judgment interest thereafter at the rate of 5.255% per annum. It argues that Mich. Comp. Laws § 600.6013(5) requires the award of prejudgment interest and that 28 U.S.C. § 1961 requires the award of post-judgment interest.

■ O'Sullivan correctly argues that it was entitled to prejudgment and post-judgment interest under state and federal statutes, and that the district court erred by failing to make this determination in its original judgment. By awarding damages to O'Sullivan, the district court entered a money judgment. *See Dept' of Treasury v. Central Wayne County Sanitation Auth.*, 186 Mich.App. 58, 463 N.W.2d 120, 122 (Mich.Ct.App.1990) ("A money judgment is one which adjudges the payment of a sum of money as distinguished from directing an act to be done."). Under Michigan law, a prevailing party is entitled to statutory prejudgment interest in a civil action even if an order or judgment does not expressly provide for it. *See* Mich. Comp. Laws § 600.6013(5) & (6) (requiring and specifying the means of calculating prejudgment interest). A federal statute also requires that post-judgment interest be awarded on any money judgment in a civil case before a district court. *See* 28 U.S.C. § 1961(a) (providing for the payment of interest that "shall be calculated from the date of the entry of the judgment").

■ On April 7, 2000, in response to O'Sullivan's first motion to alter or amend the judgment, the district court entered an order dismissing O'Sullivan's motion on the basis that it did not have jurisdiction because the case was currently on appeal before the Sixth Circuit. This is incorrect. When a party has filed a timely motion to alter or amend a judgment after a notice of appeal has been filed, the district court still retains jurisdiction to consider the motion. *See* Fed. R.App. P. 4(a)(4)(A)(iv); Fed. R.App. P. 4(a)(4) advisory committee's note to 1993 amendments ("A notice filed before the filing of one of the specified motions [including a motion to alter or amend the judgment under Rule 59] . . . is, in effect, suspended until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the court of appeals."). The district court therefore erred in dismissing O'Sullivan's motion on the basis of a lack of jurisdiction.

Given that the district court was required under both state and federal law to award prejudgment and post-judgment interest, it should have granted O'Sullivan's motion to alter or amend the original judgment. Doing otherwise placed O'Sullivan's

prejudgment and post-judgment interest at risk, because the Supreme Court has suggested in dicta that the omission of mandatory prejudgment interest must be brought to the attention of the district court through a Rule 59(e) motion. *See Osterneck v. Ernst & Whinney,* 489 U.S. 169, 176 n. 3, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). Moreover, by addressing O'Sullivan's Rule 59(e) motion on the merits, the district court would have "help[ed] further the important goal of avoiding piecemeal appellate review of judgments." *Id.* at 177.

█ Finally, O'Sullivan argues that prejudgment interest should have been awarded at a rate of 12% per annum, relying on Michigan law that mandates 12% interest for awards based on written instruments. To support its assertion that the award was based on a written instrument, O'Sullivan points out that the district court, in its Findings of Fact, stated that "[t]he February 15, 1996 agreement was memorialized in a letter sent to Duro–Last and Plastatech on February 27, 1996." The memorialization of the agreement in a letter, contends O'Sullivan, means that the district court based its award on a written instrument, not on an oral agreement.

We are not persuaded. Although O'Sullivan correctly points out that Michigan law requires a 12% prejudgment interest rate for awards based on written instruments, *see* Mich. Comp. Laws § 600.6013(5), the district court instead found that the agreement was based on the oral understanding reached during the February 15, 1996 meeting. There is no contract signed by either Duro–Last or Plastatech. The only written aspect of the agreement was its subsequent memorialization in the form of O'Sullivan's February 27, 1996 letter. Indeed, the district court expressly concluded that the judgment was a "judgment rendered on an oral contract,"

and "not a judgment rendered on a written instrument." We find no error in the district court's determination that the 12% interest rate is not applicable to O'Sullivan's damage award.

## III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court with respect to the award of damages, and REMAND the case for the calculation of prejudgment and post-judgment interest due O'Sullivan.